**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JULIAN T. NETTLES-BEY, | ) | |
| Plaintiff, | ) | **Case No. 11 C 8022** |
| | ) | |
| v. | ) | **Judge Joan B. Gottschall** |
| | ) | |
| OFFICER BRODERICK BURKE, | ) | |
| OFFICER PHILIP WILLIAMS, and the | ) | |
| VILLAGE OF SOUTH HOLLAND, | ) | |
| Defendants.[1] | ) | |

## MEMORANDUM OPINION AND ORDER

After an unusual chain of events in August 2010, Village of South Holland police officers Williams and Burke arrested 73 year-old Julian Nettles-Bey (who is proceeding with the assistance of recruited counsel) for criminal trespass. Nettles-Bey contends that Officers Williams and Burke violated the Equal Protection Clause by treating him more harshly than a non-Moor suspected of trespassing because they believed (incorrectly) that he was a Moor and followed the Moorish religion. He also argues that the Village has a widespread practice of permitting its officers to exercise their discretion in a way that discriminates against individuals who are perceived to be Moors. The defendants' motions for summary judgment and to strike portions of Nettles-Bey's statement of additional facts, as well as the parties' supplemental filings addressing qualified immunity, are before the court. For the following reasons, the motion to strike is denied, the Village and the defendant officers are not entitled to summary

---

[1] On January 25, 2013, the court dismissed certain claims against Officers Burke and Williams and dismissed the claims against Timothy Charles Lapp and "unknown tow truck driver." (Dkt. 56.) The court also dismissed the claims against defendants Cars Collision Center and Tony Klcyzk, with leave to replead by February 28, 2013. As Nettles-Bey did not replead as to these defendants, they remain dismissed. Thus, as reflected in Nettles-Bey's second amended complaint (Dkt. 125), the remaining defendants are the Village of South Holland and Officers Burke and Williams.

judgment as to Nettles-Bey's equal protection claim, fact questions about that claim mean that the officers are not entitled to qualified immunity, and the Village's motion for summary judgment as to Nettles-Bey's *Monell* claim is granted.

## I. BACKGROUND

The court begins with a summary of the facts presented by the parties and then considers the defendants' motion to strike portions of Nettles-Bey's statement of additional facts.

### A. The Parties

Members of the Moorish Science Temple, also known as "Moors," append their last name with "-El" or "-Bey." Plaintiff Julian Nettles-Bey resides in Knoxville, Tennessee and his legal last name bestowed at birth was Nettles-Bey. Nettles-Bey is not a Moor, and does not, and has not, practiced any religion. He is currently retired and spends his time working with African-American youth around the country. When traveling, he relies upon the courtesies of the communities he serves to provide housing and cover his expenses. The remaining defendants are the Village of South Holland and South Holland police officers Philip Williams and Broderick Burke.

### B. Nettles-Bey's Arrival at 84 Woodland Drive, South Holland[2]

From August 3, 2006, to January 5, 2011, Adolph Clark owned the residence located at 84 Woodland Drive in South Holland, Illinois. He did not reside there in August 2010. On either August 17, 2010 or August 18, 2010, Clark entered the garage of his vacant home and

---

[2]  The record refers to both 84 Woodland Drive and 84 Woodland Avenue, both in South Holland, Illinois. The court takes judicial notice that the correct address is 84 Woodland Drive. *See Central Green Co. v. United States*, 531 U.S. 425, 435 (2001) (taking judicial notice of "basic" geographical facts).

noticed real estate documents in plain sight inside a stranger's Volkswagen that was parked in his garage. These documents referred to "Moors" where an owner's name would be listed. Clark left the paperwork in the Volkswagen. (Clark Dep., Dkt. 97-5, at 166.)

On August 18, 2010, based on his discovery of the Volkswagen in his garage, Clark called the South Holland Police Department. Officers Burke and Williams responded and searched the home and garage. In addition, they inspected the Volkswagen and wrote down its VIN number. Nettles-Bey asserts that in the course of locating the VIN number, the officers necessarily would have seen the real estate paperwork in the Volkswagen referring to Moors. The parties dispute whether Clark told Officer Burke that he wanted to file a complaint against anyone found in the house. The police did not find anyone inside the house.

In the meantime, an individual named Sabeel El-Bey contacted Nettles-Bey and invited him to stay at what El-Bey described as his house, located at 84 Woodland Drive in South Holland, Illinois. Sabeel El-Bey gave Nettles-Bey a garage door opener so Nettles-Bey could enter the house through the garage. Felicia Mohammad, whom Nettles-Bey had previously met, was also staying at the house.[3] Nettles-Bey stayed at 84 Woodland Drive for one night – August 21 through 22, 2010. While there, he parked his minivan in the driveway.

On the morning of August 22, before Nettles-Bey left the house, Clark again called the South Holland Police to report possible intruders at 84 Woodland Drive. Officers Burke and Williams again responded. Clark asserts that he told the officers that he wanted to press charges

---

[3] Ultimately, all three occupants of the house filed suit based on their interactions with police relating to 84 Woodland Drive in South Holland. Nettles-Bey's complaint is the only one that survived (albeit in part) a motion to dismiss. *See Muhammad v. Village of South Holland*, No. 12 C 275 (N.D. Ill.) (Darrah, J.); *El-Bey v. Village of South Holland*, No. 11 C 4949 (N.D. Ill.) (Leinenweber, J.), *aff'd by* No. 12-2288 (7th Cir. Mar. 25, 2013) (unpublished order).

against anyone who was in his house. Nettles-Bey denies that Clark advised police that Clark wanted to press charges based on the absence of any notation in the August 22, 2010 police report to this effect.

## C.    The Decision to Charge Nettles-Bey and His Arrest

Upon the officers' arrival at the house located at 84 Woodland Drive – which belonged to Clark despite El-Bey's claim that he owned it – Officer Williams questioned Nettles-Bey. At that time, Nettles-Bey did not know that El-Bey's claim of ownership was false. According to Nettles-Bey, after he stated his name, Officer Williams became more aggressive with his tone of voice, and would not let Nettles-Bey (who has a prostate condition) use the restroom. Nettles-Bey told the officers that El-Bey, the homeowner, had given him permission to stay at the house and that El-Bey had leased the house to Mohammed. The officers nevertheless charged Nettles-Bey with criminal trespass to real property pursuant to 720 Ill. Comp. Stat. § 5/21-3, arrested him, transported him to the South Holland police station, and towed his minivan.[4]

Clark came to the police station and signed a criminal complaint against Nettles-Bey for trespassing. Clark asserts although he saw the term "Moor" on paperwork in the car in the garage, he did not realize at the time that this referred to a religion. (Clark Dep., Dkt. 97-5, at 156-57, 162-63.)

According to both Officer Burke and Officer Williams, if a complaining witness wants to have an individual prosecuted for criminal trespass, they have no discretion and must proceed

---

[4] According to Nettles-Bey, criminal trespass is a Class A misdemeanor which subjects an individual to a maximum of a one year in jail and a fine of up to $2,500. In contrast, a municipal ordinance citation for trespass subjects an individual to a maximum of six months in jail and a fine of up to $750. Ultimately, after a trial, Nettles-Bey was acquitted of criminal trespass.

with that charge.  The Village's copy of the Illinois Criminal Law Manual summarizes the requirements for the offense of criminal trespass to property.  (Ex. 18, Dkt. 109-9, at 720 Ill. Comp. Stat. § 5/21-3 (2012)).[5]  The manual does not address the proper response when a complaining witness desires to have an individual prosecuted for criminal trespass.

Chief Baker trains Village officers in the elements of criminal trespass, which requires that a person "knowingly and without authority enters either a residence or a building without any authority."  (Baker Dep., Dkt. 97-12, at 180.)  According to Chief Baker, Village of South Holland officers have discretion when deciding whether to bring a charge of criminal trespass versus charging an individual with a violation of the municipal ordinance prohibiting trespassing.  (*Id*. at 200-01.)  As he explained, the officers "have the discretion and of course the overall approval comes from the watch commander."  (*Id*. at 286.)

Chief Baker trained Village officers on the difference between charging an individual with violation of the municipal ordinance covering trespassing and the more serious offense of criminal trespass in violation of Illinois law.  He agreed that if "an officer wants to send a message to this individual, he might select the heftier offense, criminal offense under the state code, as opposed to the mere municipal lesser offense under the municipal code."  (*Id*. at 287.)  He also agreed that if an officer had an adverse history with a specific group, it would be "horrible" but the officer could select the state offense of criminal trespass, subject to the approval of a supervisor.  (*Id*. at 287-89.)

---

[5]  South Holland Police Chief Greg Baker testified that the criminal trespass section of the 2012 version of the manual was the same as the one in effect when Nettles-Bey was charged. (Baker Dep., Dkt. 97-12, at 180.)

**D.** **Nettles-Bey's Contention That South Holland Police Officers Believed He Was a Moor**

**1.** **Police Reports**

The original police report for Nettles-Bey's August 22, 2010 arrest and Chief Baker's supplemental report referred to Nettles-Bey both as "Julian Turhaan Nettles" and "Julian T. Nettles-Bey." In 2013, the Village corrected the report to reflect Nettles-Bey's full name – including "-Bey" – throughout. Nettles-Bey asserts that the absence of the "-Bey" on the original documents (actually, a portion of the original documents) shows that as of the time of his arrest, the Village and its officers believed that he was a Moor who had followed the convention of adding "-Bey" to his actual last name.[6]

**2.** **Nettles-Bey's State Court Trial**

Among other witnesses, Officer Burke and Officer Williams testified during Nettles-Bey's criminal trial. (Trial Transcript, Dkt. 109-3.) Officer Burke testified that when he questioned Nettles-Bey about his presence at the house at 84 Woodland Drive, Nettles-Bey gave him El-Bey's telephone number and said he was staying at the house at El-Bey's invitation. Based on this information, Officer Burke placed a telephone call to El-Bey at an unspecified time on the day of Nettles-Bey's arrest. El-Bey told Burke "that he was trustee for the Moorish Temple. And, he was working with them on leasing the property." (*Id*. at 28.) Officer Burke also testified that Mohammad represented that Nettles-Bey had introduced her to El-Bey and that she was living at the house "with a lease from [El-Bey] from the Temple." (*Id*. at 30.) At his

---

[6] In contrast, the Village cites to a "Name Merge Log" (whatever that is) that is purportedly attached as "Ex.12 at PJM 1589." Exhibit 12 is the transcript of proceedings from Nettles-Bey's criminal trial. Thus, the cited evidence does not support the defendants' denial of this fact.

deposition, Officer Burke testified that this call occurred after Nettles-Bey's arrest and that he had not heard of the Moorish Science Temple or Moors prior to this time.  (Burke Dep., Dkt. 97-6, at 132-36.)

Officer Williams stated that he was familiar with the Moorish Science Temple and its members, who "call themselves sovereign citizens."  (Trial Transcript, Dkt. 109-3, at 69.)  Based on his experience working in other Chicago suburbs, he was aware that "people calling themselves "Moors" were "taking over foreclosed homes.  And, having phoney [sic] documentation that they own the home" such as "documentation from the recorder of deeds."  (*Id.* at 71.)  At trial, Officer Williams testified that at an unspecified time, he had dealings with El-Bey in connection with the home at 84 Woodlawn and knew that El-Bey was a Moor.

### 3. Officer Zeller

Another South Holland police officer (Officer Zeller) transported Nettles-Bey from the house at 84 Woodland Drive to the South Holland police station.  At his deposition, Nettles-Bey testified that Officer Zeller said, "I have one of them," and that "later on," he assumed that this meant that the officer thought that he "was another of the  Moorish Science Temple people."  (Nettles-Bey Dep., Dkt. 97-9, at 116-117.)

### 4. Chief Baker

The parties dispute whether South Holland Police Chief Greg Baker (the Village's Rule 30(b)(6) witness) testified at his deposition that at the time of Nettles-Bey's arrest, the Village (presumably, the defendant officers) believed that Nettles-Bey was a Moor.  Chief Baker seemingly testified both that Nettles-Bey *was* and *was not* a Moor as follows:

> Q.  And you had absolutely no idea or no thought that he, too, may be affiliated with the Moor movement, is that correct, sir?

A.    At that particular time?

Q.    Yes.

A.    Yes.

Q:    So at the time of his [Nettles-Bey's] arrest, you thought he was part of the
      Moor movement, correct, sir?

[Village attorney]: Objection, mischaracterizes his last answer. Go ahead.

A:    Yes.

(Baker Dep., Dkt. 97-12, at 332.)

**E.    The Village of South Holland's Treatment of Other Alleged Trespassers and
        Another Moor**

On October 11, 2009, Officer "P. Williams"[7] responded to a report that an individual had

entered into a homeowner's garage and removed a snow blower without permission. The

homeowner wanted to sign a criminal complaint against the individual (whose name did not end

with "-El" or "-Bey"). Officer Williams issued a municipal ordinance trespass citation. He did

not take the individual to the South Holland police station. (Dkt. 109-10.)

On December 8, 2011, Village police officers Carlson and Koster responded to a report

of an unauthorized person in a residence. The officers issued municipal ordinance trespass

citations to the two individuals at the home (whose names did not end with "-El" or "-Bey"),

allowed them to depart, and advised them that they would be arrested for criminal trespass if

they returned. The officers did not take the individuals to the South Holland police station.

(Dkt. 109-11.)

---

[7]  Based on his star number, this officer is Philip Williams, a defendant in this case.

On January 20, 2012, Village police officer Rhodes responded to a report of an unauthorized person in a residence. Officer Rhodes escorted the individual (whose name did not end with "-El" or "-Bey") out of the home, confiscated the house keys and garage door opener that the individual had pursuant to a purported oral lease, and issued a municipal ordinance trespass citation. Officer Rhodes did not take the individual to the South Holland police station. (Dkt. 109-13.)

On March 24, 2012, Officer R. Williams responded to a report of suspicious persons in a homeowner's yard. The officer found two unauthorized individuals (whose names did not end with "-El" or "-Bey") and issued municipal ordinance trespass citations. He did not take the individuals to the South Holland police station. (Dkt. 109-14.)

On September 17, 2012, Officers Roberts, Rugone, Hurckes, and Mitchell responded to a report of criminal trespass to property. They saw an open side door and inside the home and found four people whose name did not end with "-El" or "-Bey." The officers issued municipal ordinance trespass citations. They impounded the car that was parked in the driveway but did not take the individuals to the South Holland police station. (Dkt. 109-15.)

On January 2, 2014, Officer Mitchell was flagged down by homeowners who reported an unauthorized person at their vacant home. Officer Mitchell went to the property with Officer Williams (a different Officer Williams than the defendant in this case) and found an individual whose name did not end with "-El" or "-Bey." The officers advised her that she had been "scammed" by someone purporting to have authority to rent the house. The officers allowed her to depart the following morning and advised her that if she failed to do so, she would be charged with criminal trespass to residence. (Dkt. 109-16.) The individual was still at the home the

following day.  Officer Williams offered her a one-night voucher at a South Holland Motel and

provided contact information for two organizations that provide emergency housing assistance.

He warned the individual that if she remained at the house, she would be subject to Village

ordinance or criminal charges.  Officer Williams did not file charges or take the individual to the

South Holland police station.  (Dkt. 109-16.)

The record reflects one other interaction – besides the incident at issue in this case

involving Nettles-Bey, El-Bey, and Mohammad – between the South Holland police and an

individual who was perceived as being a Moor.  In August 2011, approximately one year after

Nettles-Bey's arrest, the South Holland police conducted a traffic stop after seeing that Airrion

Blake-Bey's vehicle did not have a rear license plate.  The traffic stop was video recorded.

Blake-Bey was arrested and charged with "No Valid Driver's License, No Valid Registration,

No Proof of Insurance and Obstructing a Peace Officer" because he refused to furnish his name,

date of birth, or any identification.

## II.   THE DEFENDANTS' MOTION TO STRIKE

The defendants have moved to strike portions of Nettles-Bey's statement of additional

facts based on four alleged defects.

## A.    Compound Facts

First, the defendants contend that Nettles-Bey's statement of additional facts includes

improper compound facts.  The court has broad discretion when enforcing the local rules

governing the presentation of motions for summary judgment.  *See*, *e.g.*, *Petty v. City of

Chicago*, 754 F.3d 416, 420 (7th Cir. 2014).  "[A] statement of material facts that presents one

fact at a time per paragraph would not be an efficient manner in which to present a statement of

material facts and would not be consistent with Local Rule 56.1." *Fishering v. City of Chicago*, No. 07 C 6650, 2009 WL 395462, at *2 (N.D. Ill. Feb. 18, 2009). Where Nettles-Bey's statements of additional facts include multiple sentences, the sentences are all clearly interrelated so that it would make no sense to split them into separate paragraphs. Although asserting more than one fact per paragraph may "expose the party to an argument that Local Rule 56.1 is being abused," no such abuse occurred here. *See Deffebaugh v. BNSF Ry. Co.*, 12 C 10244, 2015 WL 1230075, at *5 (N.D. Ill. Mar. 16, 2015).

## B.    Police Reports

Second, the defendants challenge Nettles-Bey's citations to police reports, arguing that the contents of the reports are inadmissible for the truth of the matter therein. The police reports at issue concern individuals whose names do not end with "-Bey" or "-El" who were found on someone else's property in South Holland without permission. Some of the reports indicate that the homeowner wanted to sign a criminal complaint.[8] Nettles-Bey offers the reports to show what charges were brought when individuals whose names did not end in "-Bey" or "-El" trespassed.

Most of the disputed additional facts based on police reports do not refer to third party statements memorialized in the reports. Instead, they contain the names of the affected individuals and state if they were charged and, if so, with what offense. Generally, police reports are inadmissible hearsay "'except to the extent to which they incorporate firsthand observations

---

[8] One of the police reports includes an alleged statement by the charged individual that the homeowner had previously warned him about trespassing. The court need not address the parties' arguments about the admissibility of this statement as this alleged statement is not a material fact.

-11-

of the officer.' This is because the presumption of reliability that serves as the premise for the public-records exception does not attach to third parties who themselves have no public duty to report." *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013) (quoting Fed. R. Evid. 803(8)); Fed. R. Evid. 803(8) (under the public record exception to the hearsay rule, "[a] record or statement of a public office" is admissible if "(A) it sets out: (i) the office's activities [and] a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel . . . . and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness"). Under this theory, the names of the charged individuals and the charges that were brought are not hearsay because this information was provided by an officer who had a duty to report it. *See Downie v. Klincar*, 759 F. Supp. 425, 428 (N.D. Ill. 1991) (quoting *United States v. Bell*, 785 F.2d 640, 644 (7th Cir. 1986) ("[police] reports, in a literal sense, may be reports kept in the ordinary course of business, and they 'may be demonstrably reliable evidence of the fact that an arrest was made, [but] they are significantly less reliable evidence of whether the allegations of criminal conduct they contain are true'").

As noted above, Officers Burke and Williams testified at their depositions that if a complaining witness wishes to sign a criminal complaint supporting a charge of criminal trespass, they have no discretion to issue a municipal ordinance violation and must proceed with a criminal charge. Several police reports contain information about the affected homeowners' desire to sign a criminal complaint. For example, ¶ 81 of Nettles-Bey's statement of additional facts asserts that a certain police report indicates that an individual whose last name did not end with "-Bey" or "-El" committed criminal trespass to property by entering a garage and taking a

snow blower without permission. The police report reflects that the homeowner with the purloined snow blower told the officers that he wanted to sign a criminal complaint. Nevertheless, Officer Williams (the same Officer Williams who is a defendant in this case) issued a municipal ordinance trespass citation.

Nettles-Bey offers the portions of the police reports that state that a homeowner told an officer that he or she wanted to sign a criminal complaint to show the effect the statements had on the officers responsible for recommending the charges to bring; Nettles-Bey is not trying to establish that the declarants' statements about their desire to sign a criminal complaint were true. In the context of deciding if probable cause supported a plaintiff's arrest, the Seventh Circuit has held that statements in an "arrest report . . . describing the details of the alleged altercation between [the plaintiff and the alleged assault victim are admissible] not for their truth, but to show the effect that the statements had on the officers." *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000); *see also Cairel v. Alderden*, No. 09 C 1878, 2014 WL 916364, at *1 (N.D. Ill. Mar. 6, 2014) (denying motion to strike paragraphs of a Rule 56.1 statement based on police reports because "the defendants have offered most of the challenged statements for their effect on the defendants – whether they created probable cause to charge the defendants for robbery and impersonating a police officer – *not* for their truth.") (emphasis in original).

The officers assert that they lacked discretion to charge a trespasser with a municipal ordinance violation if the homeowner wanted to pursue a state criminal charge. However, the police reports show that individuals were charged with municipal ordinance violations even when the homeowners wanted to pursue state criminal charges. The statements at issue are thus

admissible not for their truth, but to show that the officers had a reason to file a state criminal charge, given their alleged lack of discretion, but did not always do so.

## C.        Legal Conclusions

Third, the defendants contend that Nettles-Bey improperly styled legal conclusions as "facts." Legal arguments in Rule 56.1 submissions are improper. *See*, *e.g.*, *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008). The allegedly offending paragraphs (¶¶ 70-71 of Nettles-Bey's additional facts) relate to criminal trespass under Illinois law. Principles of state law are not facts. However, the court may take judicial notice of state statutes and interpret state court decisions interpreting those statutes. *See Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) ("We hold that matters of public record such as state statutes, city charters, and city ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice."). While the contentions at issue arguably should appear only in Nettles-Bey's memorandum of law, the court will not disregard them merely because they also appear in his statement of additional facts.

## D.        The Printout from the Moorish Science Temple's Website

Finally, the defendants take issue with a printout from the Moorish Science Temple website that is attached to a declaration from one of Nettles-Bey's attorneys, arguing that it was not produced in discovery and is hearsay. The disputed additional facts contain basic information about the Moorish Science Temple that is well-known to the court, which has presided over numerous cases involving Moors. For example, in paragraph 46 of Nettles-Bey's additional facts, he states that "[m]embers of the Moorish Science Temple, also known as

"Moors," append their last name with "-El" or "-Bey," and may be recognized as Moors by virtue of their hyphenated last name."

The defendants do not challenge Nettles-Bey's summary of this naming convention, which is consistent with numerous federal court cases involving Moors. *See, e.g., Hughey-Bey v. Ill. Sec'y of State*, No. CIV 04-893JPG, 2005 WL 1660692, at *1 n.1 (S.D. Ill. July 14, 2005) (noting that the plaintiff changed his name from Hughey to Hughey-Bey "following the tenets of the Moorish Science Temple"). The naming convention is necessary to understand the chain of events leading to Nettles-Bey's arrest since the key factual allegation in this case is that the officers thought Nettles-Bey was a Moor because his name ends in "-Bey." Most of the challenged additional facts cite to the printout because they refer in some fashion to the naming convention.

The naming convention is a matter of common knowledge that is not reasonably subject to dispute. *See* Fed. R. Evid. 201. The other facts supported by the printout are that Moors generally follow "Islamism" and that there is no Moor movement in Knoxville, Tennessee (where Nettles-Bey resides). The former is supported by additional evidence besides the printout and the latter is not material. The motion to strike the printout is denied, either on the merits or because the materials sought to be excluded do not form a basis for the court's ruling.

### III.  THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**A.    Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted).

**B.      Discussion**

The court previously dismissed a variety of claims against different defendants pursuant to Fed. R. Civ. P. 12(b)(6). Count I (equal protection/selective enforcement against Officers Williams and Burke) and Count III (a *Monell* claim against the Village based on its training and policies relating to the police's treatment of individuals who appear to be Moors) remain and are the subject of the defendants' motion for summary judgment.

**1.      Equal Protection**

The use of impermissible racial classifications to selectively enforce the law violates the Equal Protection Clause of the Fourteenth Amendment. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race . . . . [T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause."). To establish a violation of the Equal Protection Clause in the racial profiling context, a plaintiff "must prove that the

defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001).

### a. Motivated by a Discriminatory Purpose

The defendant officers contend that they could not have acted with discriminatory intent on the day of Nettles-Bey's arrest because they did not believe that he was a Moor since at that time, they were unfamiliar with Moors and the Moorish Science Temple. In response, Nettles-Bey notes that when Officers Burke and Williams entered the garage at 84 Woodland Drive on August 18, 2010, they inspected the Volkswagen and wrote down its VIN number. According to Nettles-Bey, while the officers were locating the VIN number inside the car, they necessarily would have seen the real estate paperwork in the Volkswagen – which Clark testified was lying out in plain sight – that referred to the Moorish Science Temple where an owner's name would be listed.

Nettles-Bey contends that this paperwork would clearly be relevant to officers called to investigate a report of unauthorized entry into a home and that the reference to Moors impeaches the officers' denial of any knowledge of Moors prior to Nettles-Bey's arrest on August 22, 2010. He then asserts that the paperwork shows that it was "likely" that the officers knew that a Moor or Moors were inside the home, even if they did not know who was specifically inside the home. (Pl.'s Resp., Dkt. 105, at 10.) Clark testified that he left the paperwork where he found it in the Volkswagen. A jury must decide whether the officers' denial of all knowledge of Moors and the Moorish Science Temple is credible given Clark's testimony about the paperwork.

This is supported by one possible reading of Chief Baker's deposition testimony. Chief Baker – the Village's Rule 30(b)(6) witness – testified that he (presumably Officers Williams

and Burke, who effected Nettles-Bey's arrest) believed, at the time of the arrest, that Nettles-Bey "was part of the Moor movement." (Baker Dep., Dkt. 97-12, at 332.) Chief Baker also offered the conflicting opinion that at the time of Nettles-Bey's arrest, he "had absolutely no idea or no thought that [Nettles-Bey], too, may be affiliated with the Moor movement." (*Id*.) This conflict cannot be resolved at the summary judgment stage.

Moreover, Officer Williams' disavowal of all knowledge of Moors prior to Nettles-Bey's arrest is inconsistent with his testimony during the state court criminal trial about his experiences with Moors when he worked as an officer in other Chicago suburbs. While he did not provide dates, it appears that these experiences predate his tenure with the South Holland Police Department.[9] During Nettles-Bey's state court trial, Officer Williams testified that he was familiar with the Moorish Science Temple and its members, who "call themselves sovereign citizens" and "Moors," and "tak[e] over foreclosed homes" using "phoney documentation that they own the home" such as "documentation from the recorder of deeds." (Trial Transcript, Dkt. 109-3, at 69.) A fact question thus exists regarding Officer Williams' claim that he learned about Moors only *after* Nettles-Bey's arrest. In addition, as noted by Nettles-Bey, the prior experience with Moors/sovereign citizens supports Nettles-Bey's position that the real estate paperwork in the Volkswagen stating that Moors owned the home would have placed Officer Williams on notice that a Moor or Moors were likely inside the home.

Nettles-Bey also challenges Officers Williams and Burke's claim that they did not exercise discretion when deciding whether to charge Nettles-Bey with criminal trespassing

---

[9] If this is not the case, the experiences with other suburbs is only one of several bases for the denial of the defendants' summary judgment motion.

because Clark wanted them to bring that charge so they were required to do so. Nettles-Bey has identified evidence in the record sufficient to create a fact question as to this contention, including Chief Baker's testimony at his deposition stating that Village of South Holland officers have discretion when deciding whether to bring a charge of criminal trespass versus a violation of the municipal ordinance prohibiting trespassing.

Nettles-Bey also stresses that in 2009, Officer Williams responded to a report of snow blower theft from a garage. The alleged trespasser's name did not end with "-El" or "-Bey" and the homeowner wanted to sign a criminal complaint. Despite his alleged lack of discretion given the homeowner's request, Officer Williams issued a municipal ordinance citation. In addition, he did not take the individual to the South Holland police station.

Nettles-Bey, therefore, has identified evidence sufficient to show that a trial is necessary to determine if the defendant officers were motivated by a discriminatory purpose in connection with his arrest.

### b. Discriminatory Effect

To establish an equal protection violation, Nettles-Bey must also "come forward with evidence that similarly situated individuals in the unprotected group were treated differently." *Logan v. City of Chicago*, 891 F. Supp.2d 897, 905-06 (N.D. Ill. 2012). He can carry this burden with direct or statistical evidence. *Id.* To show "discriminatory effect," he must demonstrate that he: (1) belongs to a protected class; (2) is "otherwise similarly situated to members of the unprotected class"; and (3) was treated differently from members of the unprotected class. *Id.* (quoting *Chavez*, 251 F.3d at 635-36).

The defendants stress that Nettles-Bey has no statistical evidence supporting his claim that they discriminated against individuals believed to be Moors. But direct evidence can also suffice. *See Logan*, 891 F. Supp.2d at 906. Nettles-Bey has identified evidence supporting his claim that the defendants treat trespassing suspects more harshly if they believe that the suspects are Moors. Specifically, the police reports summarized above show that other alleged trespassers whose names did not end in "-Bey" or "-El" were not charged with criminal trespassing, even when a homeowner wanted to sign a criminal complaint based on an incident where Officer Williams, as in this case, recommended the charge to bring. Other individuals whose explanations for their presence in another person's home were similar to Nettles-Bey's were charged with municipal ordinance violations or allowed to depart without any charge, as opposed to Nettles-Bey, who was charged with criminal trespassing and taken to the South Holland police station.

For example, Village police issued a municipal ordinance trespass citation to an individual who possessed house keys and a garage door opener and told the police she was residing at the house pursuant to an alleged oral lease. Similarly, officers did not file charges against a woman who represented that she had rented the property where she was found because the officers believed she had been "scammed" by someone purporting to have authority to rent the house. The officers allowed her to depart the following morning. When she failed to do so, the officers gave her a final warning, a one-night motel voucher, and contact information for organizations that provide emergency housing assistance. Both incidents involve alleged trespassers who told police that they were at a residence with the homeowner's permission and

stand in contrast to Nettles-Bey, who gave a similar explanation but was charged with criminal trespass, arrested, and immediately transported to the South Holland police station.

The defendants argue that these incidents are irrelevant because the only documented interactions between South Holland police and Moors either track Nettles-Bey's experience (Sabeel El-Bey and Felicia Mohammad, who were found at Clark's home shortly after Nettles-Bey's arrest, were charged with criminal trespass) or show that they treat Moors respectfully and appropriately (the Airrion Blake-Bey traffic stop). Evidence about the experiences of other Moors who were arrested for criminal trespass in circumstances similar to Nettles-Bey, however, is irrelevant. *See Logan*, 891 F. Supp.2d at 905-06. The proper inquiry centers on similarly situated individuals who are *not* Moors. *See id*. at 906 ("At most, plaintiff has shown that other members of the protected group were treated similarly . . . . [b]ut this is not what the equal protection analysis requires. On the contrary, plaintiff would have had to come forward with evidence that similarly situated individuals in the unprotected group were treated differently."). Moreover, the fact that Nettles-Bey does not criticize a traffic stop of a Moor (Airrion Blake-Bey) is unsurprising, since Blake-Bey and Nettles-Bey were not similarly situated.

In sum, the record shows that three individuals allegedly perceived to be Moors – Nettles-Bey, Sabeel El-Bey and Felicia Mohammad – were all charged with criminal trespassing after police discovered them in a home owned by someone who wanted them to be criminally charged. Police officers knew that Nettles-Bey claimed that he had been invited to stay by the owner of the home (whose name also ended in "-Bey") and had inspected Mohammad's car when searching Clark's garage, which had real estate paperwork in plain view that indicated that Moors owned the home. In contrast, police officers interacting with other individuals who were

found in a home and claimed to be authorized renters but whose names did not indicate that they were Moors elected to bring a municipal violation charge or simply asked the unauthorized person to leave.  Moreover, defendant Officer Williams charged an individual who allegedly stole a snow blower, who was in a garage without permission and whose name did not end in "-Bey" or "-El," with a municipal ordinance violation, even though the homeowner wanted to sign a criminal complaint.

The defendants contend that "distilled to its essence," Nettles-Bey's position is that "the South Holland Police should have given [him] a break."  (Defs.' Reply, Dkt. 112, at 2.)  As detailed above, this is not Nettles-Bey's position, as the defendants should well know.  The defendants' motion for summary judgment on the merits of Nettles-Bey's equal protection claim is denied.

### 2.    Qualified Immunity

Officer Williams and Officer Burke argue, in the alternative, that the defense of qualified immunity shields them from Nettles-Bey's equal protection claim.  The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Williams v. City of Chic.*, 733 F.3d 749, 758 (7th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)).  When evaluating whether qualified immunity applies, the court must ask "two questions:  (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation."  *Id*.  If "critical facts are in dispute the trial can't be headed off."

*Egebergh v. Nicholson*, 272 F.3d 925, 926 (7th Cir. 2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985)).

In support of their qualified immunity argument, the defendant officers repeat their merits argument by contending that no evidence shows that they selectively enforced the law against Nettles-Bey. The court, however, has found that material issues of disputed fact mean that this issue cannot be resolved without a trial.

The defendant officers also assert that no authority holds that it is improper to arrest an individual who is found trespassing in a home when the homeowner wishes to press charges before learning the trespasser's identity. This argument assumes that the defendants' version of the facts is undisputed, which is not the case. The court, instead, must view the facts in the light most favorable to Nettles-Bey when determining if qualified immunity applies. *See*, *e.g.*, *Weinmann v. McClone*, 787 F.3d 444, 446 (7th Cir. 2015) (noting that when determining if the defense of qualified immunity is available at the summary judgment stage, the court must "accept the plaintiff's version of the facts, without vouching for their ultimate accuracy").

When the court considers Nettles-Bey's version of events, as it must at this stage in the proceedings, ample authority would have put the officers on notice that they were violating the law at the time of Nettles-Bey's arrest, as the proposition that police officers may not enforce the laws more harshly based on a suspect's religion dates back to the 1800s. *See Peer v. Cauble*, No. 08 C 5469, 2011 WL 814159, at *6 (N.D. Ill. Mar. 1, 2011) ("It has been clear since *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), that the Equal Protection Clause prohibits discriminatory enforcement 'based on race, national origin, or other suspect classifications.'"). Accordingly, the defense of qualified immunity is not available.

### 3. Nettles-Bey's *Monell* Claim

Under *Monell*, when "the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury . . . the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Isolated instances of allegedly unconstitutional conduct are insufficient to establish a widespread practice. *Palka v. City of Chicago*, 662 F.3d 428, 435 (7th Cir. 2011) (collecting cases holding that one to three incidences are insufficient to support a *Monell* claim); *see also Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (a plaintiff who alleges a *Monell* claim based on an alleged widespread policy or practice must show that "there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work.").

Nettles-Bey argues that the defendants' treatment of him shows that the Village of South Holland had a widespread practice of targeting people it believes are Moors. However, arresting and charging three people (Nettles-Bey, El-Bey, and Mohammad) in two groups (first Nettles-Bey, then El-Bey and Mohammad) based on a single course of conduct relating to Clark's home is not enough to show a widespread custom, policy, or practice. *See Palka*, 662 F.3d at 435; *Calhoun*, 408 F.3d at 380. In his response to the motion for summary judgment, Nettles-Bey does not provide any authority supporting his *Monell* claim; he simply argues that the Village's practices are a flagrant violation of his rights. (Pl.'s Resp., Dkt. 105, at 13-15.) This is not enough to create a triable issue. Thus, the defendants' motion for summary judgment on Nettles-Bey's *Monell* claim is granted.

## IV.  Conclusion

The defendants' motion to strike portions of Nettles-Bey's statement of additional facts [110] is denied.  The defendants' motion for summary judgment [93] is granted in part and denied in part.  Specifically, the Village and the defendant officers are not entitled to summary judgment as to the merits of Nettles-Bey's equal protection claim and are not entitled to qualified immunity on that claim, but the Village's motion for summary judgment as to Nettles-Bey's *Monell* claim is granted.  This case is set for status on September 18, 2015 at 9:30 a.m.  The parties should be prepared to advise the court regarding the status of any settlement discussions and, if necessary, to set firm trial and related dates.


Date:   August 4, 2015                                   _____/s/_____
                                                          Joan B. Gottschall
                                                          United States District Judge